The next case for argument is 141544, Apoxico v. Colorado Altitude Traing. I should be fairly clear from the briefing that Apoxico believes there have been a number of errors in the proceedings below. There's one theme that kind of runs through all of the errors and all of the problems that Apoxico had, and that is the failure of the court below to, we believe, give appropriate weight to the jury findings in both of the two trials. Since we've got two kind of jury trials going on here, this is just kind of more of a process question than a substantive question. But if we conclude that there was some error in the 2009 new trial decision, but ultimately when we get to the issues that are laid out as of 2012 in that trial, we think what was done in the context of that trial was okay. Where does that leave us? Well, I would believe that if the first trial was right, there shouldn't have been a second trial, so all of the second trial issues become moot, no matter how they might be resolved. And so what do we do? Send it back for yet another trial? Well, it depends on what Your Honor's end up doing. If the court decides that the first jury verdict should be reinstated, the only thing that would need to be retried is the issue of damages, and that would be as simple as counting, I would believe. Can I ask you, and this again is more of a process, but let's assume hypothetically that we're looking at the record here and we're looking at all the patents, and we conclude at least two things with respect to correct claim construction. One is that portable does not cover these big tents or the rooms, that portable really means portable. And second, that vents really means vents, so that just the, I mean, it has to be something that consciously is put in as a vent, not just air seeping out. So that seems to blow up most of the infringement case that's before us, right? And so it's not clear to me, when you look at the record and what's gone on historically, I don't know whether issues were raised and waived. I don't know if because the judge focused on controller he never got to those other questions, at least in 2009. It's hard to put the pieces together, and that's why I appreciate what you're saying, that if there wasn't that much of a problem on the record, on the arguments on 2009, that would be reinstated. But don't we have before us all of these questions appropriately? I'm sorry, that's a long question, but I'm having some trouble deciding what's before us and what we can consider. Trying to parse the questions, of course, we would argue that the claim constructions of the first trial were the correct ones, not the claim constructions of the second trial. But was that an issue in the first trial? Did he decide that portable was okay or not? I mean, that didn't seem to come up. I mean, he threw the stuff out predominantly because of the controller question, right? That's correct. So he never reached those other questions. But if they had come up on appeal at that juncture, they could have argued these are the alternative, could they not? I'm not sure because they didn't object to the claim constructions. The claim construction at the time for portable was, I think, easily transported or moved to something fairly short, a one-sentence thing that's in the briefs. But it's not that half-page, three-quarter-page long claim construction he gave in the second trial. And there was no objection to any argument that the claim construction of the first trial was incorrect in a certain way by it not being preserved on the record. Well, let's ask it a little differently. During the 2009 trial, did they dispute infringement because they contended that their tents were not portable? To be perfectly honest, that's not entirely clear whether they were arguing lack of portability or lack of collapsibility. That was another claim term that was argued at the first trial and surrendered at the second trial. There was a J-Mall motion in 2009, right? Yes. The new trial motion was in combination with J-Mall and new trial. Right. So, obviously, one of the arguments was whether their tents met the substantially maintaining certain oxygen concentration, right? And that's the second issue, yes. So that they argued, and the district court relied on that piece to order a new trial. Yes. In that same motion, did they also argue about portability? I believe that they raised the issue a little bit, but I don't think that it was the crux of their motion in that. How about vents? Was vents argued in that 2009 motion? Not to the degree that was argued in the 2012 where the court had the different claim construction, because the construction of vents, again, was a fairly short and concise construction in 2009. Not the two or three page long construction. In the end, there was a dispute that they were raising in their J-Mall motion in 2009 regarding whether their zippers can fairly be understood to meet your claim limitation on vents and apertures. Well, I don't believe that the zippers played a prominent role in the 2009 trial as they did in the 2012 trial. In 2009, we also have on the table the fact that there are other openings in the various structures. If it's a room structure, there are openings around light switches and underneath doors and through windows and all that. In the tents, you also have not only the zippers, which are present, but also the fabric around the zippers, which is a porous material which has openings in it. We believe that those would qualify as apertures. Under the claim construction offered by the court would be vents as well. I appreciate and understand what your responses are to Judge Chet, but your responses are sort of halfway there. It's like you can't be half pregnant when you say, yeah, it was there, but they didn't focus on it. Yes, I mean, I'm not criticizing you. You're trying to be forthcoming, and I appreciate that. But for our purposes, it's not clear to me that if the issue were in play, even if it wasn't the main focus or whatever, isn't that sufficient to preserve it? And therefore, if we're looking, can we look fairly at questions in public claims construction and infringement on the vent question, on the portability question, when we're revisiting even the 2009 trial? I believe not, Your Honor, because I believe that for an error to be preserved or an argument for an error to be preserved in making JMAL or a new trial order, it had to have been raised as an objection to the jury construction or somehow raised during the trial. And it was certainly not raised during the trial with an appropriate motion later renewed in the JMAL. Well, is that because, and this comes up in a lot of our cases, there's some fuzziness between what's a question of claim construction and what's a question of infringement. So if you've got a claim construction that's kind of ambiguous, you may decide strategically you're not going to challenge that, but in terms of infringement, you're going to kind of argue the portability question of financial infringement. So were those arguments made at trial? Did the trial involve what's really a vent, this isn't really a vent, and this isn't really portable? Was that parcel of the trial? I would say with respect to vents, definitely not. With respect to portable, only inferentially. The problem was that the defense at the first trial, the 2009 trial, the third trial counsel for Kat took the position that they didn't have to argue what was not present in the accused product. It was their basic position that hypoxicists had to prove everything, and they will tell you later what parts they failed to prove. And so to say that they raised the issue I don't think is a fairly descriptive or a fair way of describing what happened at that first trial. Now, just trying to... Oh, I was just going to ask, the appellees are bankrupt right now, is that right? Yes, well, that is to say the corporate appellee is bankrupt. There is also the question of inducement by the individual, Mr. Larry Cutt, he is not in bankruptcy at this time. Okay, so let's assume that we were to conclude hypothetically that the district court judge would correct on his conclusions with regard to inducement. What happens to your case? Well, there would still be issues that we would need to pursue. Obviously, we would stand to collect less money in theory, but there are still questions in the bankruptcy about how much damages would be collectible. In the first instance, there would be... Of course, it all depends on how much money is actually in the bankruptcy estate, and if the answer is zero, then there is no money to be collected under any theory. But since the bankruptcy was filed in 2010, there was a substantial amount of infringement which took place between 2010 and today, until the end of May when they actually shuttered their business under Chapter 11. So that whatever sales they made, the damages that would be accrued post-petition are treated as, as I understand it, not a bankruptcy after, as administrative claims which are given priority in the bankruptcy proceeding, so that they would be given a higher priority than pre-petition claims which are treated as pre-petition claims. So whatever money may be in the bankruptcy estate, if there is a higher percentage of damages, a higher amount of damages awarded, hypoxia would be entitled to a greater percentage of the administrative claims that might be collectible after the following petition. Let me turn, before your time runs out, to the other kind of claim construction question, which the district court clearly did rely on, which is the controller, and whether or not the error limitation is met. I mean, there's a theory, and you're right about that, there is a theory in patent law like just because you add something else, you're arguing here the controller, the claim limitations are otherwise met, you're still infringing. But the district court clearly thought another way. He thought that all of really the function served by the error pressure limitations was being performed by this other thing, which is the controller. And in theory, if he's right about that, then that does get you out from under infringement, right? So why was he wrong? No, I would disagree. I don't believe that that's... Well, I mean, maybe you have a DOE claim to whether or not this is different, but it's functions in the same function, same way, same result, right? But that sounds to me more like a DOE argument than an actual literal one. Which is why, in the case of literal infringement, we don't believe that the functionality really comes into play. The question is whether there is a structure there that performs these functions, not whether the operation of the device... Well, the way the claims read, it's really not just... It's the structure that's performing the function. That's all inherent in the claims, right? It's not the claim for A, B, and C. It's all related to the function, right? Yes, Your Honor, but it's also true that it's the law. That so long as the product is capable of performing these functions, then the regime infringes. It doesn't have to be shown to be constantly performing them, so long as it's capable of performing them. And the evidence showed that under most circumstances, there would not be any change in the concentration of oxygen and that the interior atmosphere within the enclosures, whether it be a tent, a room, a chamber, however described, is controlled by only two things. One, the walls of the structure which confine the interior atmosphere and segregate it from the outside. And the one device which changes the concentration of anything or the composition of the atmosphere within that enclosure, and that's the gas separation device. Whether the operation of the gas separation device is controlled manually by hand or by just leaving it alone or by having some other piece of equipment change it, it's still the same function. Even with the use of the computer, the changes were only plus or minus one degree with respect to the oxygen levels. Is that right? I'm sorry, I didn't follow your question. Even with the use of the computer to change, alter the oxygen levels, any changes were within plus or minus one degree. One percent. One percent, correct. Yes, Your Honor, I believe that to be correct. The evidence, I think, showed that. And again, CAC did not put in any affirmative evidence showing that these numbers were different. They simply said that Hypoxico failed to prove it and elected not to explain how its own machines work, instead relying on Hypoxico carrying this burden of proof. There's two different categories of increased products in terms of controlled systems and non-controlled systems. And so the only dispute we're having right now about this claim limitation is the controlled systems. Is that right? Is there also a dispute between the parties on the non-controlled systems and whether the non-controlled systems are the reason? I believe not, Your Honor. I would leave it to my learned opponent to say what he's doing. I don't like putting words in his mouth. You get wet fingers when you do that. So I would prefer to say the CACs have determined that, but I don't believe that there is any argument about that. In fact, even the judge said that the argument about the reason he granted a new trial was basically the first trial was because of the controlled systems. Even though uncontrolled systems made up over 30% of the sales of CAC's product, he granted a new trial on those 30% as well. Okay. We're seriously interviewing, but we'll restore two minutes. Let's take a minute or so. I'm just curious how, before you begin, how bankrupt is CAT? I don't represent CAT in its bankruptcy proceedings. My understanding is that they—well, I know for a fact that the Chapter 11 proceeding was just this past month converted to a Chapter 7 proceeding, and a trustee has been appointed by the court for the purpose of liquidating whatever assets the company has and distributing it to creditors. My understanding is that there's not very much there, but I don't have the facts and the numbers. If we were to reverse in the 2009 trial that decision, reset it back, what issues would be remaining to be decided? The grant of the new trial in 2009. Obviously, it's our position that the judge was well within his discretion to grant a new trial in 2009. If the court were to reverse on that, there are still remaining issues involving damages. Those are the only issues I can think of. Let's assume we thought he was wrong in terms of the jury verdict, except with respect to the questions of inducement and lost profits, so there would have to be a new trial on the calculation of damages. In the jury verdict, was that severable? The $4 million, was it just differentiated between... No, my understanding is that a single verdict for $4,325,000 was awarded by the jury. I'm sorry, you said... Right. And that was all lost profit? That was on the lost profits, and the judge found that there were serious errors on the lost profits, on the jury's finding of inducement, and on the jury's finding that the controlled product infringed. That's reviewed under an abuse of discretion standard. The district court has a lot of discretion in granting a new trial, determining whether or not to grant a new trial, and the district court is not... That's a pretty high burden before he throws his jury verdict out, though, right? That is right, but he does not have to take all of the evidence in the light most favorable to the verdict holder. It's a very different standard from the JAMAL standard in the Second Circuit. The district court is permitted to view all of the evidence through his own eyes and to determine whether or not the jury reached an incorrect verdict, and if so, what happened in this case, he gave Hippoxico a second chance to prove his case three years later, and it came back and presented essentially the same evidence, which resulted in a problem. Do you happen to know, back in 2009, whether your side maintained, preserved, asserted arguments regarding portability and vents? There are a number of different issues. I can't recall exactly what was raised in that JAMAL brief, that there was a JAMAL motion made during trial and then renewed after trial. I know there are a number of different non-infringement positions, including an additional one involving a pressure differential between the inside of the tent and the outside of the tent and the tent products, and the existence of vents and apertures certainly was a contested issue at that time. And why did it take three years from the first trial to the second? I was not there at the time. From the record, I know that there was a change in counsel on Cat's side. Cat also entered into bankruptcy, made a file for bankruptcy during that period, and there were a number of different complications. I don't know the full answer to that. So Judge Chen kind of started you down this road, and you heard my dialogue with your friend. My questions were really quite confused, but hopefully you appreciated what I was getting at, which is the extent to which, if we're not comfortable really with the basis that the judge articulated in 2009, whether it's enough to say if we really are fairly firm, if the claim construction questions were before us, we would go a certain way in your favor on portability and on vents, whether we can carry that conclusion back to affirm the 2009. And if you think we can, then give me some basis for saying that. I guess the place to start is to say that the claim constructions at 2009 were not the same as the claim constructions that Hypoxico advocated for in 2012. For instance, on the portability question, in 2009, the portable was construed to mean easily transported or moved, something along those lines. And in 2012, Hypoxico was advocating for the construction of capable being moved, which is... Okay, so on that point, did you preserve that argument? Was that in place that you're saying that no, even the tent stuff is too big, and that these products don't infringe at least the 2-2-2 patent? Yeah, the portability was an issue at that trial in 2012, under the construction of easily transported or moved. Okay. All of these questions were... Do you believe, is that a yes answer? I just want to be accurate. Yes answer in response to... It was an issue, it was in play, it was articulated and raised and preserved by your side. That is my recollection, yes. Okay. How is it preserved? Is it an objection to instruction? Is there a chain rule? How is the construction issue preserved? Well, in this case, I was referring to the fact that the claim construction at the 2009 trial was different than what Hypoxico was advocating for at the 2012 trial. Okay, your opponent is saying that the claim construction on events of portability that were in play in 2012 were not in play in 2009. Right, there were different issues at that trial, and there was different counsel, and the claim construction that were advocated for at the 2012 trial, those claim construction issues did not come into play in the 2009 trial. Okay, but what I heard you say was that in 2009, your side was perfectly satisfied with the claim construction and limited it to something that is easily portable. So then, if you had the claim construction you wanted, maybe it was a question of preserving it in the context of infringement. Did you then argue against the jury verdict saying, no, they couldn't have found this was portable because of the claim construction? It's an infringement question that you were perhaps arguing at that stage, not really a claim construction question, that your tents could not possibly infringe this claim because your tents are not portable. That is correct. It would be an argument on the burden. When you say it would be, is that what happened, though? That is my recollection. What about the vets? What was the history there on the vet question? Was the claim construction the same all along? Did you argue against the claim construction, or was it one that you favored that you think more stent to an infringement question? The history of the claim construction, the only other time when there was a claim construction that took place was at the same time that the previous district court judge, Judge Kodal, was in charge of the case in connection with a summary judgment motion very early on in the case. But at the trial, there were additional claim construction issues raised before the judge at the 2009 trial. Did you use the vet question as a basis for arguing that the jury verdict should be overturned? The vet question? Yes, that your products, the accused products, don't satisfy this claim limitation. Yes, it was an issue that the, for instance, in the controlled products, that the incidental openings were not at an aperture. So that was an issue. Is the vent issue also in play? That's the 652 patent or whatever the other one is. Does that cover all of the products, or do you suggest is the vent question only pertaining to the control? No, it's a necessary element to be proven on all the products. On the control products, the room systems, it comes down to whether or not the incidental openings can be vents and apertures. On the tent products, there's also an issue of incidental openings. But in addition to that, as was litigated at the second trial, there's a question about whether the zippers that can be opened to release air and install air conditioning units could be vents and apertures within the medium of that. Why don't you turn to briefly the controller issue that your friend was talking about. And his theory is it infringes if it contains limitations, even if there's this other thing in addition, the controller. What's your view of that? Right, and we set a case in our brief, an outside-the-box case, which involved a situation where a product was materially changed by adding a component. So, of course, there's always the requirement that you have to show that the accused product meets each and every claim limitation, and that burden is never reduced. And the question comes down to whether the controller is a material change to the product such that the product does not infringe the requirement that the gas-separating unit and the chamber together maintain the substantial concentration of oxygen. Before you keep going on controller, do you agree that your non-controlled accused products do meet this particular claim limitation of maintaining the oxygen concentration? Because your gas-separation device, in combination with your room, meet that limitation. Just to keep things clear, the first trial and the second trial, the first trial there was an additional issue of there was a pressure argument, that the pressure inside the tent was different than the pressure outside the tent. At the second trial, the only defense on that issue was with respect to the controlled systems. Okay, so we're just talking about, there's something about the controlled systems controller that now makes something that was infringing the non-controlled systems, now all of a sudden, or that made those things non-infringing, making... It's just that the controllers, the presence of the controller all of a sudden makes something that was otherwise infringing non-infringing. I take issue only in that we're talking about a single claim. There are other limitations that make those products not infringing, such as the vents and apertures. The tents don't have vents and apertures, so they can't infringe those claims. What's the relationship between the controller and the gas-separation device? Are they integrated, or is one like 20 feet away from the other? If I looked at them, what would I be seeing? It's a separate component. As a hypoxic was expertly admitted at trial, it is not part of the gas-separation unit, but it's a separate component of the system that interacts with the gas-separation unit and instructs it how to maintain the partial pressure of oxygen, not the constant concentration of oxygen. And they're connected together by wires? Yeah, through electronics. What about your friend's other argument that even if it operates in a different way, since it meets the limitations and then knows more, it's capable of infringing? That theory, at least, that your products are capable of infringing, even if, in fact, they're used in a different way with the controller. The problem with capable is that they still have a burden to show that the product does infringe, and you can say that it's capable of infringing without providing evidence showing that it does, in fact, infringe. It does not meet that claim limitation. When you say it does in fact infringe, are you saying that it's actually been used in that way or that it does, in fact, even when it's still in the box? That it cannot be used in that way. There's no evidence that it can be used in that way. To put this into context, to talk about the zipper question, they put on no evidence showing that the zippers could be partially opened to act as vents in the meaning of the patent, and they argue, well, they're capable of being opened, but without any evidence showing that they could actually be opened and operate as vents. You can't meet that claim. What you mean to say is not that they could be opened, but that they actually were opened. Right, and there was no evidence... Because they could be opened to serve as vents. Your point is that they didn't ever put on any evidence where the zippers were, I guess, transformed or converted into being positioned in a way that they served as vents. Right, so then they would not be vents within the meaning of the patent, so it would not meet that claim limitation, because without proof that they could be opened in such a way to act as vents, and no such proof of use was put in the case, then they are not vents. Just as a door could be opened to let someone in and out, the door is a door, it is not a vent. And without putting on proof showing that the door could actually be opened, say, three inches, and when it's opened three inches, you could... Well, can't we take judicial notice of certain things? Of course, a zipper, by definition, is made for purposes of being open and closed. I'm not clear on what you're arguing. Are you saying that we don't know that the zipper could have actually been opened? The testimony of the case showed that when the zippers... The only testimony on use of those zippers in the case was by one of CAT's employees who testified that when those zippers were opened, it actually destroyed the hypoxic environment, so it no longer operated. Now, what you've been talking about in terms of the experts and the witnesses, this was all in the 2012 trial, right? Our most recent discussion has concentrated on 2012. Well, was this also in 2009? Where were these issues in 2009? So, the reason that this became a big issue in the 2012 trial is because the judge narrowed the issues on the 652 patent, and the only issue that went to the jury was whether these zippers on the tents on the 652 patent qualified as vents and apertures. And what about... Was that... You say the only issue they went to is that. Well, in 2009, was that also before the jury in addition to other issues, or was that not before the jury? Yes. Hypoxic had the burden to prove that there were no... that the CAT's products had vents and apertures. You say that the judge narrowed those particular issues. Did the judge do that sua sponte? Were there arguments that the judge should do that? Right. So, hypoxic argues in its brief that there was no claim construction briefing at the second trial, but it was not a sua sponte decision. There was extensive argument between the parties and the judge on claim construction issues and on what issues would go to the jury. Is it correct that the judge made that claim construction just prior to going to the jury at the close of evidence? There were two different claim constructions. It was certainly not a surprise to either party. There had been discussion throughout trial on what those claim constructions would be. They were finalized right before it went to the jury, but it had been aired throughout trial. So, a quick question on lost profits. The theory that was advanced by hypoxico, did it include sales made abroad? Did it account for sales made abroad? No, that was part of the issue about whether there were competitors. They argued that there were only two competitors, and there's a lot of evidence in the record that there were other competitors, some of those competitors located abroad. So, there was no part of the lost profit theory that included or tried to account for sales that were made abroad, foreign sales. That's correct. Okay. Thank you. I'll be fast. First, with respect to foreign sales, Your Honor, there was no distinction drawn between sales made by CAT, whether the recipient was abroad or in the United States. CAT is located in Colorado. Any sale made from Colorado to wherever else was included, and there was no issue with the trial about whether these sales had been excluded because they were abroad or otherwise. The only issue of exclusion came up in connection with 1498, which we haven't discussed, but it was in the brief, about whether or not military sales should have been included. And that came up. Your Honors have the papers. The other issue I would like... Just to clarify, are these products by CAT made in the United States and then shipped abroad? I'm talking about foreign sales. Or are they made abroad? Well, it depends on what you mean by made. The various components are made here and shipped abroad and assembled. If you have a tent, what is shipped abroad is the same as shipped here, which is that the folded-up tent is in a box and the pipes are in a box. So this isn't the 271A theory, it's the 271F1, I'm guessing, correctly, theory? The components are shipped abroad and then they're made, they're put together abroad? That they are sold here and shipped abroad, yes. You think the sale is here? Yes. And I'll point out that that's not an issue that was raised below by any party. Have I answered your question? Yes. I would like to point out that with respect to claim construction, this Court has been very clear that we have to start analyzing claim construction, the ordinary meaning of the words that are to be construed. At no point did Judge Grisey start or depart from any meaning of what the claims mean, the dictionary words or the common understanding of... Are you talking about claim construction or are you talking about events? Of any of them, whether events, apertures, or portable. I would point out that with respect to portable, changing this construction from the first trial to the second trial, he offered no explanation why all of a sudden, well, one sentence or half-sentence explanation was no longer acceptable. Other than to say he believed that the 222 patent was... He couldn't see how the 222 patent was valid. And so he then... It's either portable or it's not. And then he went off from there. Okay. Thank you. Thank you. Thank you, counsel, the case is submitted.